FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 29, 2018

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

ELVIS CAMILLO RENTERIA LOPEZ,

          Petitioner,

          v.

JAMES KEY,

          Respondent.

NO:  4:16-cv-05156-SAB

**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS**

Before the Court is Elvis Camillo Renteria Lopez's First Amended Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus By A Person in State Custody, ECF No. 11. Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C § 2254. Respondent is represented by Alex Kostin and Paul Weisser. This matter was heard without oral argument. After careful review and consideration of the relevant state court record and the submissions of the parties, it is hereby determined that the Petition be denied. In accord with Rule 8 of the Rules Governing Section 2254 cases, and in response to Petitioner's request, the Court reviewed the proceedings to determine whether an evidentiary hearing is required. Petitioner's request for an evidentiary hearing is denied.

//

//

**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS + 1**

## Background

On April 26, 2012, Petitioner was convicted by a jury in Benton County Superior Court of (1) assault in the second degree, with a deadly weapon; (2) assault in the third degree; (3) robbery in the first degree; and (4) two counts of attempting to elude, with endangerment enhancements. ECF No. 38-1 at 17. He was sentenced to 132 months confinement in total. ECF No. 38-1 at 22. Petitioner filed a direct appeal to the Washington State Court of Appeals, Division III, ECF No. 38-1 at 32, which affirmed the conviction but remanded for a proper determination of Petitioner's offender score and resentencing, if necessary. ECF No. 39-1 at 57. Petitioner petitioned for review to the Washington Supreme Court. ECF No. 39-1 at 58. The Washington Supreme Court denied the petition. ECF No. 39-1 at 79. On March 18, 2015, a mandate was issued certifying that the opinion of the Court of Appeals of the State of Washington, Division III, filed on August 5, 2014, became the decision terminating further review by the court. ECF No. 39-1 at 84.

A resentencing hearing was held on May 12, 2015 wherein the parties argued whether a 2000 conviction for first degree robbery "washed out" for purposes of calculating Petitioner's offender score. ECF No. 39-1 at 153. The superior court agreed that the conviction did not wash out for offender score calculation purposes and his original sentence stood. ECF No. 39-1 at 156. Petitioner appealed. ECF No. 39-1 at 149. On appeal, the State conceded that it failed to adequately prove Petitioner's criminal history for offender score calculation purposes, and the Washington State Court of Appeals, Division III, again remanded for resentencing. ECF No. 39-1 at 168. A mandate issued on January 21, 2016 and the Court of Appeals' opinion became the decision terminating review. ECF No. 40-1 at 1.

On July 17, 2014, while his first direct appeal was still pending, Petitioner filed a pro se personal restraint petition ("PRP") with the Washington Court of

Appeals. ECF No. 40-1 at 3. This petition was stayed during the pendency of his direct appeal, which was lifted April 21, 2015. ECF No. 40-1 at 13. Petitioner filed a supplemental PRP on June 3, 2015, alleging prosecutorial and judicial misconduct, double jeopardy, and violation of speedy trial and sentencing rights, and ineffective assistance of counsel. ECF No. 40-1 at 15. On February 23, 2016, the Court of Appeals issued an order addressing each of Petitioner's claims and dismissing the PRP as frivolous. ECF No. 41-1 at 53. Petitioner sought discretionary review by the Washington Supreme Court. ECF No. 43-1 at 73. On September 16, 2016, the Commissioner denied review. ECF No. 44-1 at 47. The Court of Appeals filed an amended certificate of finality on December 19, 2016. ECF No. 44-1 at 56.

While his motion for discretionary review was pending, Petitioner filed a Second PRP. ECF No. 44-1 at 58. The Court of Appeals dismissed the second PRP as successive and frivolous because Petitioner could not certify that he has not filed a previous petition on similar grounds. ECF No. 45-1 at 37. Petitioner filed a motion for discretionary review with the Washington Supreme Court, ECF No. 45-1 at 40, which was denied by the Commissioner who concluded that the Court of Appeals properly dismissed his second PRP as successive and frivolous, ECF No. 45-1 at 46. A certificate of finality was filed on April 17, 2017. ECF No. 45-1 at 56.

On October 26, 2016, Petitioner filed a third PRP with the Washington Court of Appeals. ECF No. 45-1 at 58. The Court of Appeals dismissed the petition as untimely under Wash. Rev. Code § 10.73.090(1) and contained mixed claims that could be exempt from the time bar. ECF No. 45-1 at 93. Petitioner sought discretionary review. ECF No. 45-1 at 95. The Commissioner denied his motion on August 10, 2017. ECF No. 46-1 at 4.

On December 5, 2016, Petitioner filed his pro se petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody. ECF No. 1. His

**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS ~ 3**

petition was amended on May 15, 2017. ECF No. 11. He asserts the following purported grounds for relief: (1) double jeopardy; (2) malicious and vindictive prosecution by increasing charges before second trial and utilizing perjured testimony; (3) cruel and unusual punishment; (4) governmental and prosecutorial misconduct by knowingly introducing perjured testimony and excluding impeachment evidence; (5) violation of Confrontation Clause by denying defense counsel opportunity to cross examine witness regarding 911 call; (6) "burden of proof" by prosecutor failing to present evidence to support witness's claim of injury; (7) denial of fair trial and impartial judge by excluding impeachment evidence; and (8) ineffective assistance of counsel by failing to impeach perjured testimony and conflict of interest because counsel was not permitted to introduce 911 call, allegedly causing counsel to "choose between petitioner or the state/court." *Id.* The Court dismissed his third ground for relief and directed service on the Government. ECF No. 12.

## Facts

In dismissing Petitioner's first PRP, the Washington Court of Appeals outlined the facts as follows:

> Mr. Lopez's convictions stemmed from an April 13, 2010 incident in which he assaulted his girlfriend Ramona Gonzalez, took her car, and then assaulted law enforcement officers during the ensuing police chase. His case proceeded to a first trial on March 19, 2012, on charges of three counts of second degree assault, each with a deadly weapon enhancement allegation; two counts of attempting to elude a police vehicle, each with an endangerment enhancement allegation; and one count each of third degree assault; second degree taking a motor vehicle without permission with a domestic violence allegation; and fourth degree assault with a domestic violence allegation.
>
> Ms. Gonzalez testified at trial that she had been in a relationship with Mr. Lopez for about a year. She said he would stay at her house a few nights per week and that he kept clothes there but actually lived at his parents' house across the street. (PRP Exhibit D, RP 3, 16-17) She testified that he had taken her car without her permission earlier in the

day on April 13. When he returned, she told him she wanted the car back and that he needed to leave it. (RP 6-8) But he ran around the car with the keys in his hand, singing "Ring Around the Rosie." (RP 9) Ms. Gonzalez then tried to position herself near the driver's side door to keep him from getting into the car. She testified that he threatened to throw her in the road like a "rag doll" if she did not get out of the way. (RP 9) He then pushed her into the driver's side mirror and then pushed her again, face down into the pavement, causing an injury to her face. He then got in the car and drove away. Ms. Gonzalez saw a woman present at the time. (RP 9-11)

The woman who was present was Shawna Nissen. She testified she was driving in the area and saw a male and a female, whom she later identified as Ms. Gonzalez and Mr. Lopez, running around a vehicle. She observed the man grab the woman and throw her down onto the street. Ms. Nissen stopped and told the man to leave her alone. (PRP Exhibit E, RP 25-26) Ms. Nissen said "the man then looked up and she was going out of the street and he picked her up like a rag doll and there was a brown Suburban coming toward her and it had to swerve to get into the other lane." (RP 26) The man got in the car and took off. (Id.)

Sheriff s Deputy Doug Hollenbeck testified about his involvement in the case. He said that as a result of law enforcement reports regarding Mr. Lopez's purported whereabouts after the incident, he "ran code to Benton City." (PRP Exhibit F, RP 80-82) He then spontaneously added that "the information was this guy is armed with a knife and he didn't want to go back to prison." (RP 83) The defense moved for a mistrial and the court granted the motion. (Id.)

Proceedings reconvened on March 21, 2012. The State filed a third amended information that eliminated two second degree assault counts and the fourth degree assault count but added a first degree robbery charge for the forcible taking of Ms Gonzalez's vehicle. (State's Response, Attachment Q Mr. Lopez's counsel reserved a motion regarding amendment of the information for hearing on April 4. (State's Response, Attachment D) That day, Mr. Lopez entered a not guilty plea. The defense ultimately did not object to the amendment. (State's Response, Attachment E)

Mr. Lopez's second trial commenced on April 23, 2012. Ms. Gonzalez gave similar testimony as in the first trial that Mr. Lopez did not have permission to take her car and that he did not live with her, but would stay with her for a couple of days and go back and forth

between her house and his parents' house. (PRP Exhibit G, RP 58-59, 65, 83) She also gave a similar account of the incident. She said she was standing in the street by the driver's side door telling him he could not take the car. He refused to give her the keys. He said if she did not get out of the way he would throw her in the road like a rag doll. She had her back to the driver's side mirror. She pushed him to move him and he threw her into the street, about a foot from the centerline. She said there was a car that drove around and another car that came the other way. (RP 69-70) She hit her face on the pavement when he pushed her. He got into her car and left. (RP 70, 74-75) A woman had meanwhile arrived on the scene. (RP 75-76) Ms. Gonzalez admitted she could not recollect the event with 100 percent accuracy because it had occurred a long time ago, but she could "tell you the main points of it." (RP 81-82)

Ms. Nissen also testified similarly to her testimony in the first trial. She saw a man (whom she identified in court as Mr. Lopez) "grabbing a female victim by the head and he kind of threw her into the road." (PRP Exhibit I, RP 257) Ms. Nissen then yelled for him to stop and got out of her car calling 911. There was a brown Suburban coming from the opposite direction, and "he literally picked her up as she's trying to stand up out of the road, like a rag doll, and he tossed her into oncoming traffic where the Suburban had to miss her, and he hopped into the car and took off...." Id. Ms. Nissen stayed until police arrived but needed to leave to tend to her young daughter who was in the car crying. Ms. Nissen thus did not tell the police at that time that the victim had been pushed. The officers told her to make a statement and send it in. She did so. (RP 258, 259-60) Ms. Nissen testified she did not know Ms. Gonzalez or Mr. Lopez at the time of the incident. (RP 26 1)

Sheriff's Deputy Arin Reining testified that following a lengthy car chase, she was directly behind Mr. Lopez's vehicle when officers boxed him in with their patrol cars. Deputy Reining's patrol vehicle was equipped with a camera that recorded video of the events. The video was admitted into evidence and played to the jury during her testimony. (PRP Exhibit H, RP 212, 217-19; State's Response, Attachment G) Deputy Reining explained that as she was exiting her vehicle, Mr. Lopez put his car in reverse and rammed his vehicle into hers. She testified this caused her open patrol car door to hit her in the face and injure her lip. (RP 219-21)

The defense theory was that Mr. Lopez did not commit robbery by taking the car because he actually did live full time at Ms. Gonzalez's house and as a family member was a regular driver of the vehicle without needing her permission. Two defense witnesses—Mr. Lopez's stepfather Tad Miers, Sr., and his son Tad Miers, Jr.— testified consistent with this theory and gave a sharply different account of the incident than related by Ms. Gonzalez and Ms. Nissen. Tad Miers, Sr., said Ms. Gonzalez was hitting Mr. Lopez in the chest for about 30 seconds and he gave her a push out of the way so he could get in the car. She stumbled backwards into the grass on the passenger side of the car—not into the street. Mr. Lopez then got in the car and drove away without touching her again. (PRP Exhibit J, RP 308-09) Tad Miers, Jr., testified that Ms. Gonzalez and Mr. Lopez were on the passenger side of the car and she was angrily flailing her arms at him. He pushed her aside. She took a step back and tumbled onto the area where the grass met the sidewalk, not in the street. Mr. Lopez did not assault her again. He went around to the driver's side and took off. Mr. Miers said he had no knowledge of a woman being present and calling 911; he saw no one else at the scene. (PRP Exhibit K, RP 329-33) Both of the Miers witnesses insisted Mr. Lopez lived solely with Ms. Gonzalez and her children as a family and he regularly drove her vehicle without needing permission. (RP 311-14,323-27)

During closing, the State argued the following:

[H]e starts out by assaulting his girlfriend, and defense can argue all day long that, "Oh, she just fell," or "Oh, he was defending himself," but we heard from a party who didn't even know these people, and she gave you testimony about what she saw.

This was a rather serious assault. Actually, [Ms. Nissen] describes something even worse than what Ramona described to you because she is objective. She comes up on the scene. She sees the defendant actually throwing her on the ground and slamming her face into the pavement, which is certainly ... what it appears from the pictures to be what had happened.

She has a rather serious abrasion on the side of her face. Ms. Nissen also testified that when he threw her into the street she almost got hit by a car. Now, his family

testified that she wasn't in the street. She was actually on
the sidewalk.

Well, so how do we get from her being on the
sidewalk to her almost getting hit by a car? I would
submit to you obviously his family has its own - their
own biases. They are not objective. They are not
somebody who doesn't know these parties.

So, certainly I would submit to you that you need
to take Ms. Nissen's testimony a lot more seriously than
that of his family. But here again, there's a dispute
between the defense witnesses and Ms. Nissen as to
where these parties were. The defense arguing she wasn't
blocking the [driver's] side of the door. In fact, she was
on the opposite side of the car where the sidewalk was.

Again, her testimony was she was blocking the
driver's door because she didn't want him to get into the
car. Ms. Nissen's testimony was that, yes, she, in fact
was on the roadside of the car. Now, was he defending
himself? Absolutely not. Even his stepfather said that he
shoved her out of the way to get into the car.

That is key.

(PRP Exhibit M, RP 436-37)

The jury convicted Mr. Lopez as charged.

ECF No. 43-1 at 54-59.

## Discussion

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in
custody pursuant to the judgment of a state court if the custody is in violation of
the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a);
*Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Petitioner was convicted by jury
verdict in Benton County Superior Court of second-degree assault with a deadly
weapon, third-degree assault, first-degree robbery, and two counts of attempting to
elude a police vehicle with endangerment enhancements. The court sentenced him
to 132 months' imprisonment. Petitioner filed a federal habeas corpus petition
pursuant to 28 U.S.C. § 2254 and is currently in Washington State custody

**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS** + 8

confined at the Airway Heights Corrections Center in Airway Heights, Washington. Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution and the conviction challenged arises out of the Benton County Superior Court, which is located within the jurisdiction of this Court. Accordingly, the Court has jurisdiction over the action.

## II.    Legal Standard

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004). Since Petitioner filed the petition for habeas corpus after April 24, 1996, the provisions of the AEDPA govern.

Under the AEDPA, an application for habeas corpus will not be granted unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003). Only "clearly established Federal law, as determined by the Supreme Court of the United States" can be the basis for relief under the AEDPA. *Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005). "Clearly established Federal law" is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. *Lockyer*, 538 U.S. at 71.

A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court cases or "if the state court confronts a set of facts that are materially indistinguishable from" a Supreme Court decision but "nevertheless arrives at a result different from" that precedent. *Id.* at 73. A state court decision is

an "unreasonable application of clearly established federal law" if "the state court identifies the correct governing legal principle" from a Supreme Court decision "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75. A federal court may also grant a writ of habeas corpus if a material factual finding of the state court reflects "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). State court findings of fact are presumptively correct in federal habeas proceedings, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). A pro se prisoner's request for relief will be construed liberally as a habeas petition despite formal imperfections. *United States v. Seesing*, 234 F.3d 456, 463-64 (9th Cir. 2000) (holding that pro se filings are to be liberally construed).

## III. Review of Petitioner's Claims

### A. Double Jeopardy

Petitioner first argues that because the prosecutor intentionally provoked a mistrial during his first trial, double jeopardy attached and he could not be retried for the same offenses. Respondent disagrees, contending there is no evidence in the state court record suggesting the prosecution intended to goad Petitioner into moving for a mistrial. Moreover, Respondent asserts that this Court should hold that the Washington State Court of Appeals' factual finding that there was no

intent to provoke Petitioner into moving for a mistrial is not unreasonable in light of the evidence and therefore entitled to deference.[1]

The Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb," U.S. Const. amend. V, and is applicable to the states through the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784 (1969). It protects a criminal defendant from repeated prosecutions for the same offense. *United States v. Dinitz*, 424 U.S. 600, 606 (1976). The Fifth Amendment protects defendants in cases in which "a judge exercises his authority to help the prosecution, at a trial in which its case is going badly, by affording it another, more favorable opportunity to convict the accused." *Gori v. United States*, 367 U.S. 364, 369 (1961). Double jeopardy principles, however, do not ordinarily apply where the defendant requests a mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 673-76 (1982). However, "[t]he Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions." *Id.* at 673 (quoting *Dinitz*, 424 U.S. at 611). "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* at 676.

During Petitioner's first trial, the defense moved for a mistrial after the following exchange:

> Q [Prosecutor]    If you can give us a summary of what your involvement was?

---

[1] Where a state court makes a finding that the prosecutor did not intend to goad the defendant into moving for a mistrial, the defendant must show by clear and convincing evidence that the state court's factual finding was unreasonable in light of the evidence in the state court record. *See Rutherford v. Crosby*, 385 F.3d 1300, 1307-08 (citing 28 U.S.C. § 2254(d)(2)).

**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS** + 11

A [Deputy Hollenbeck]   On that day I was assigned to zone three four, which is the Benton City area so I was the deputy responsible for that area if calls come out. At the time of the incident with Mr. Lopez I was transporting somebody to jail and leaving jail but I was scanning Richland radio traffic. I came to understand they were having an incident where Mr. Lopez was returning a vehicle and then when he was confronted by his girlfriend he assaulted her and took the vehicle.

MR. ETHERTON [Defense Counsel]: I will object and move and [sic] move to strike. All this stuff is hearsay and nonresponsive to the question, I think.

MS. WHITMIRE [Prosecutor]:  Actually, Your Honor, it's evidence we already know and it explains why he did what he did.

MR. ETHERTON: We don't know if he saw it.

THE COURT:        That's a question for the jury.

BY MS. WHITMIRE: (Continuing)

Q        If you make it clear that it was dispatch?

A        I'm understanding what is happening in Richland and the extreme danger that was involved and we started getting information trickling in that he was going to be in the Benton City area. As this happened, it's standard procedure to start pinging his cell phone to determine his location.

Q        Do you have any knowledge of exactly how long it took to find him between the incident in Richland and then in Benton City?

A        It was about an hour.

Q        If you could continue.

A        So I'm in the area of the jail, which is right around here, and they began to get successful pings and I was coming in the Benton City area. I'm the Benton City deputy so I said, man, I got to get to Benton City. I ran code to Benton City. The information was this guy is armed with a knife and he didn't want to go back to prison.

ECF No. 34-1 at 82-84. The trial court declared a mistrial after a defense motion wherein counsel argued that Deputy Hollenbeck's statement regarding Petitioner's previous prison sentence would prejudice the jury. Defense counsel did not raise the issue of double jeopardy at the time.

On direct appeal, the appellate court found "Mr. Lopez fails to show the State purposefully introduced this evidence intending to goad him into moving for a mistrial. Therefore, jeopardy did not terminate upon the mistrial. In sum, the

retrial did not violate double jeopardy principles." ECF No. 39-1 at 56. The state court's finding is not unreasonable. There is nothing in the record indicating that the prosecutor attempted to elicit Deputy Hollenbeck's testimony about Petitioner's prior incarceration nor that defense counsel believe the prosecution intended to provoke a mistrial. Petitioner's first ground for relief is not borne out by the record and is therefore **dismissed**.

**B. Prosecutorial Vindictiveness**

After Petitioner's first trial ended in a mistrial, the prosecution filed a third amended information charging Petitioner with first-degree robbery. Petitioner argues the amended charges resulted from prosecutorial vindictiveness. Respondent contends that Petitioner's claim is without merit because (1) defense counsel did not object to the third amended information; (2) there is no evidence in the state court record of prosecutorial vindictiveness; and (3) the Washington State Court of Appeals' adjudication of this claim is entitled to deference under 28 U.S.C. § 2254(d).

"In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). "Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). In the context of pretrial charging decisions, a presumption of prosecutorial vindictiveness is not warranted where a defendant is indicted and convicted of more serious charges after pleading not guilty and requesting a jury trial where

there is no actual evidence of vindictiveness. *United States v. Goodwin*, 457 U.S. 368, 381-82 (1982).

Petitioner initially went to trial on March 20, 2012, pursuant to a second amended information charging three counts of assault in the second degree with a deadly weapon allegation; assault in the third degree; taking a motor vehicle without permission in the second degree with a domestic violence allegation; assault in the fourth degree with a domestic violence allegation; and two counts of attempting to elude a police vehicle with notice of endangerment enhancements. ECF No. 43-1 at 10. Following the mistrial, a third amended information was filed on March 21, 2012, charging Petitioner with assault in the second degree with a deadly weapon; assault in the third degree; taking a motor vehicle without permission in the second degree with a domestic violence allegation; robbery in the first degree with a domestic violence allegation; and two counts of attempting to elude a police vehicle with notice of endangerment enhancements. ECF No. 43-1 at 17. At a hearing on March 21, 2012, defense counsel indicated he would make a motion regarding the new information at the pretrial conference on April 4, 2012, and Petitioner entered a not guilty plea at that time. ECF No. 43-1 at 24. Petitioner was arraigned on the third amended information on April 4, 2012. Defense counsel acknowledged the new robbery charged based on facts that took place at the beginning of the incident when Petitioner took the car and Petitioner pled not guilty. ECF No. 43-1 at 30. There was no formal objection or motion made. The State filed a fourth amended information on April 26, 2012 with no new counts added. ECF No. 38-1 at 11. Defense counsel had no objection to this amendment.

With regard to this claim, the Washington State Court of Appeals noted that prosecutorial vindictiveness occurs when the government acts against the defendant in response to the defendant's prior exercise of constitutional or statutory rights. ECF No. 39-1 at 54 (citing *State v. Korum*, 157 Wash.2d 614, 627 (2006)). Prosecutorial vindictiveness is presumed if the defendant proves all of the

**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS** + 14

circumstances, when taken together, support a realistic likelihood of vindictiveness. ECF No. 39-1 at 55 (citing *Korum*, 157 Wash.2d at 627)). The Court of Appeals stated that Petitioner's bare assertions fail to meet this standard and the State did not violate his due process rights. Additionally, in dismissing Petitioner's Personal Restraint Petition, the Court of Appeals noted that Petitioner made no better showing of prosecutorial vindictiveness for adding a first degree robbery charge after the mistrial. ECF No. 43-1 at 65. There was no showing that the third amended information was improper under Criminal Rule 2.1(d), defense counsel did not object to the addition or the robbery charge, Petitioner had ample time to prepare a defense, and there was no showing of prejudice by the amendment. *Id.*

The state court's finding was not unreasonable. There is no evidence in the record that the prosecutor acted vindictively in amending the charges against Petitioner following the mistrial. In a pretrial setting, the prosecutor should remain free to exercise her discretion to determine the extent of the societal interest in the prosecution. *Goodwin*, 457 U.S. at 368. An initial charging decision should not freeze future conduct on behalf of the State; a prosecutor is permitted to amend or add charges pretrial for several reasons, including a new understanding of the evidence. *Id.* at 382. The state court record indicates that is precisely what occurred in this case and the appellate court was correct to reject Petitioner's second ground for relief. Accordingly, it is **dismissed** by this Court.

### C. Prosecutorial Misconduct

Petitioner next argues that the prosecutor knowingly used witness Shawna Nissen's perjured testimony at trial. Petitioner further claims that the prosecutor improperly vouched for Nissen's testimony that he slammed victim Ramona Gonzalez's face into the ground in her closing argument. Respondent contends that Petitioner has failed to meet his burden to demonstrate Nissen's testimony was

false and that the prosecutor's closing argument did not constitute improper vouching.

### i.    Perjured Testimony

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). The same is true where the State, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* To prevail on a claim of the presentation of false evidence, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony [or evidence] was actually false, and (3) that the false testimony [or evidence] was material." *Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)). "False evidence is material 'if there is any reasonable likelihood that the false [evidence] could have affected the judgment of the jury.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

Nissen testified at trial that after she picked up her daughter from school, she went home and as she went to turn into her cul-de-sac, she saw an individual "grabbing a female victim by the head and he kind of threw her into the road." ECF No. 36-1 at 39. She further explained:

> A.    Yeah. I turned and yelled, "Stop." About this time my daughter starts crying, and as I'm getting out of the car calling 911, she's going to get out of the road. And there was like a suburban coming southbound, like a tan suburban, brown, and he literally picked her up as she's trying to stand up out of the road, like a rag doll, and he tossed her into oncoming traffic where the suburban had to miss her, and he hopped into the car and took off doing an illegal U-ey going northbound on Thayer.
> Q.    Did you stay on scene after that?
> A.    I did. I stayed—called the cops, stayed on the phone to make sure she was okay, and then I went back to my house when it was done.

Q.     Did you stay with this female? Do you know her name by chance?

A.     I don't. I don't. Huh-uh.

Q.     Did you stay with her until the police arrived?

A.     Until they arrived, and then, like I said, I had my daughter in the car crying. I had to get her bath. They told me to just make a statement and send it in.

Q.     Do you recall what her demeanor was during this time?

A.     She wasn't really answering me. Um, she was pretty much hysterical. I kept asking her if she was okay, if she was okay. She was just crying. Wouldn't really say a whole lot. So, I didn't know what she was going through.

Q.     Can you tell whether or not she had been injured?

A.     Yeah. She did have some like—like I said, she got tossed into the concrete. Her face was red right here (indicating), and she had some markings on her knees, but I didn't really—I wasn't going to check her out. I was just trying to get the cops there.

ECF No. 36-1 at 39-41.

On cross-examination, the following exchange occurred:

Q.     What do you mean by throwing?

A.     Literally. She was off the ground. He picked her up off the ground and tossed her into traffic (indicating.)

Q.     Do you remember reporting to the police that—do you remember reporting to the police—do you remember telling the police that he pushed her?

A.     No, I don't.

Q.     You don't remember doing that?

A.     I do not.

Q.     Is it possible you told the police that?

A.     No, it is not. Actually, as soon as the officer first showed up on scene, I went right to my house and they told me they'd come back and they didn't, and it wasn't until the morning when I called her to make my statement.

Q.     You called Ms. Whitmire in the morning?

A.     Yeah. I called Benton County. I didn't know who I needed to talk to. I said, "They never came back to my house last night, and I would like to make a statement." They told me to go to work, make it and fax it. I did.

Q.     Can you explain why none of the other witnesses didn't see this other throwing or tossing that you had seen?

A.     I was actually really surprised there were any other witnesses because nobody seemed to stop but myself. My neighbors came out afterwards. So, I don't know what other witnesses you would be talking about.

Q.     Well, maybe you wouldn't, but could you explain why they didn't see this other event?

A.     I cannot.

. . .

Q.     When you came on the scene, what did you see initially?

A.     As I was driving down Thayer, I saw two individuals running around a parked vehicle.

Q.     Okay, and you know who those individuals are?

A.     No. I did not at the time. They lived right down the street from me, but I did not—until I got out of my car was I able to see who they were.

Q.     Okay. So, you're identifying Mr. Lopez?

A.     Yes, he was the individual—he looked right at me when I told him to stop.

Q.     Where were you approximately—

A.     I had just turned down the Court Avenue, and I stopped right there. So, I was literally, like, almost right in front of them when I got out yelling.

. . .

Q.     Okay, and you said there was some type of marking on her knees?

A.     Yeah.

Q.     I'll get into that later. You said she fell on the concrete? Where exactly did she fall?

A.     No, she didn't fall on the concrete. She was shoved into the concrete. He grabbed her head and took her arm, and he shoved her into the concrete. She didn't fall.

Q.     Okay. So, you're saying he grabbed her head.

A.     Yes.

Q.     And pushed it into the concrete?

A.     He pushed her down to the ground. He put his hands on her twice.

Q.     Okay. Would you consider asphalt concrete or are those two different things?

A.     It's all hard, and it's all—okay. So, you could say it was the street and not the sidewalk. You could say it was asphalt.

Q.     Okay. So, it wasn't the sidewalk?

A.     No. There was no sidewalk right there, no. It's all cracked up, and you don't use it.

Q.     Okay.

A.     So, it was a street. She was in the street.

Q.     Okay. Did you see her push Mr. Lopez?

A.     I did not.

Q.     Did you see her hitting Mr. Lopez?

A.     I did not.

ECF No. 36-1 at 41-44.

In her 911 call, Nissen told the operator that she witnessed "a guy shove a lady almost into an oncoming car, pick her up, shove her again." Non-scannable CD Exhibit. Her April 16, 2010 statement to police was as follows:

> As I was driving north bound down Thayer driving towards my house I saw two individuals running around a white four door car. As I was about to turn down Gunnison Ct I saw a male later identified as Elvis Lopez grab the female by the head throwing her to the ground in the middle of the street. At this time I stopped my vehicle and yelled at him to stop. There was a brown suburban driving south bound on Thayer and as the victim tried to get up out of the street the male picked her up like a rag tossing her into oncoming traffic. The suburban had to swerve into the other lane to miss hitting the victim. The male then jumped into the white vehicle, made an illegal u-turn almost hitting another car and took off north bound on Thayer at a high rate of speed. I went over to the female victim making sure she was alright as I called 911.

ECF No. 41-1 at 37.

Petitioner's claim was adjudicated by the state court of appeals when considering his PRP. The court first noted that there was no evidence the prosecutor solicited or failed to correct false evidence. ECF No. 43-1 at 61. It went on to recount that in her written statement to police and testimony at both trials, Nissen described Petitioner picking up Gonzalez like a rag doll and tossing her into the street. While she did not use the "rag doll" term during her 911 call (which was

**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS** + 19

not offered into evidence), Nissen reported seeing a man shove a woman into an oncoming car, pick her up, and shove her again. The court found that the differences in Nissen's testimony did not establish that she was lying and further noted that "even if Ms. Nissen somehow adopted the 'rag doll' analogy from Ms. Gonzalez, it does not follow that she was being untruthful. It was the jury's province to weigh the testimony and any inconsistencies therein and to decide the credibility of the witnesses." ECF No. 43-1 at 62.

Petitioner has not demonstrated that the state court's conclusion was contrary to law or fact. Although the language used by Nissen varied slightly between her 911 call, police statement, and trial testimony, the substance was essentially the same. The question of witness credibility was properly put before the jury and defense counsel had ample opportunity to impeach Nissen with her prior statements.[2] Because there is no evidence in the record that Nissen's testimony was actually false, nor that the prosecution knew the evidence to be false yet failed to correct it, Petitioner's claim is **dismissed**.

### ii. Vouching

"As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) (quoting *United States v. Molina*, 934 F.2d 1440, 1444 (9th Cir. 1991)). "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witnesses testimony." *Id.* (citing *Molina*, 934 F.2d at 1445). Vouching is particularly problematic where witness credibility is crucial to the government's

_____

[2] The question of whether the court improperly prohibited defense counsel from introducing evidence of Nissen's 911 call is discussed in conjunction with Petitioner's Confrontation Clause claim.

case, yet, courts have recognized that "prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence, including that one of the two sides is lying." *Id.*

Petitioner does not precisely identify to which portion of the prosecutor's closing argument he objects. Respondent suggests the following:

> This was a rather serious assault. Actually [Nissen] describes something even worse than what Ramona described to you because she is objective. She comes up on the scene. She sees the defendant actually throwing her on the ground and slamming her face into the pavement, which is certainly how it—what it appears from the pictures to be what happened.
>
> She has a rather serious abrasion on the side of her face. Ms. Nissen also testified that when he threw her into the street she almost got hit by a car. Now, his family testified that she wasn't in the street. She was actually on the sidewalk. Well, so how do we get from her being on the sidewalk to her almost getting hit by a car? I would submit to you obviously his family has its own—their biases. They are not objective. They are not somebody who doesn't know these parties.
>
> So, certainly I would submit to you that you need to take Ms. Nissen's testimony a lot more seriously than that of his family. But here again, there's a dispute between the defense witnesses and Ms. Nissen as to where these parties were. Were they on the street side of the car of the sidewalk side of the car? The defense is arguing she wasn't blocking the driver's [sic] side of the door. In fact, she was on the opposite side of the car where the sidewalk was.

ECF No. 37-1 at 52-53.

In dismissing Petitioner's PRP, the Court of Appeals found that:

> Here, the deputy prosecutor did not express personal belief or argue from facts not in evidence. Instead, she properly argued a basis for the jury to find Ms. Nissen's testimony credible over that of the defense witnesses who could be considered biased because they were Mr. Lopez's family members, whereas Ms. Nissen was unknown to the parties involved. Mr. Lopez shows no vouching or other misconduct during the prosecutor's closing argument. There is no due process violation.

ECF No. 43-1 at 63.

The Court agrees that there was no improper vouching in this case. The prosecutor properly argued that Nissen's testimony should be credited over that of Petitioner's family due to bias. There were no personal assurance given by the prosecutor regarding the veracity of Nissen's testimony, nor did the prosecutor rely on evidence not before the jury. Because the Court of Appeals' ruling was not unreasonable and supported by the evidence in the record, Petitioner's claim is **dismissed**.

### D. Confrontation Clause

Petitioner next alleges a violation of his constitutional right to confront witnesses because the prosecutor and trial court prevent defense attorney from introducing evidence of Nissen's 911 call. Respondent contends that Petitioner was never denied the opportunity to present the evidence at issue and was able to cross-examine Nissen about her statements therein had he chosen to do so.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against him," U.S. Const. amend. IV, and is applicable to the states through the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403 (1965). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).

Petitioner was not denied the right to confront Nissen with the recording of her 911 call. On cross-examination, defense counsel asked Nissen if she recalled telling officers that Petitioner pushed the victim, to which she responded, no. Defense counsel decided not to bring up the 911 call on cross-examination at that time. ECF No. 36-1 at 41-44. There is no evidence in the record that defense

counsel was prohibited from doing so. Defense counsel later stated his regret that he failed to address 911 call when Nissen was on the stand, and stated he may wish to recall her as a witness:

> MR. ETHERTON: Something I should bring up right now also. There is a recording of Shawna Nissen, her 911 call, and admittedly I wish now I had brought it up while she was on the stand. I didn't, but I can recall a witness if need be, but I wanted to—and I think counsel may object, which is why I'm bringing this up, but her testimony or her statement to the police is somewhat divergent to that—than that which she testified to this morning, and I would like the jury to hear that.
>
> So, I guess I'm just giving counsel the opportunity now to object, if she wants to object to that, because I forgot to bring it up earlier, which is why I went through the witnesses, and obviously if I need to I can recall a witness, but that's where I'm at with that, just with that little recording. It lasts maybe a minute, something like that.
> . . .
> MS. WHITMIRE: Your Honor, I'll have to listen to it again. I'm not sure what disparity he's referring to. I'm not sure how her testimony was different from the 911 tape. My concern is it should have been played during her testimony to ask her about it. This is a witness who could not make it on Tuesday because she was in the emergency room all night with her daughter, and I know that she was still having issues today with her daughter's illness and had to get out of here quickly.
>
> So, I guess what I'm saying is I don't know that she's available to bring back. Certainly, I think she's entitled, and certainly the State's entitled to have her respond to any type of, I guess, credibility argument that we're having at this point in time.
> THE COURT: I have to concur with that last point. That if you impeach her, it has to be done in such a way that the State can rehabilitate her, and it would be up to you—Mr. Etherton, I've already released her from her subpoena. So, it would be up to you to get her in court.
>
> If she's in court—is the State objecting to the authenticity of the 911 call?
> MS. WHITMIRE: No.
> THE COURT: So, it sounds like they're not going to require you to bring in a witness to authenticate the call. So, if you can get her here—

MR. ETHERTON: It's not earth shattering either way. I was thinking about not bringing it in. Then I thought, well, I would. So, this issue came up. So, that's fine. If I can get her in, and I don't know her number or anything right offhand, but—

ECF No. 36-1 at 126-128. Defense counsel ultimately chose not to recall Nissen or to play the 911 recording. Neither the Court nor the prosecutor prevented Petitioner from doing so. Indeed, the prosecutor stipulated to the authenticity of the 911 recording and conceded it would be proper impeachment evidence. Accordingly, Petitioner's ground for relief under the Confrontation Clause is **dismissed**.

### E. Sufficiency of the Evidence

Petitioner challenges the sufficiency of his first-degree robbery and third-degree assault convictions. Respondent contends Petitioner's challenge to the sufficiency of the evidence of his convictions is procedurally barred. The Court agrees. However, assuming Petitioner properly exhausted his claims, Petitioner's stated ground for relief has no merit. When evaluating a claim for sufficiency of the evidence, the court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]he only question under Jackson is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). Where a state court of last review does not conclude the jury's determination was irrational, that determination is entitled to considerable deference under AEDPA. *Id.*

#### i. First-Degree Robbery

A person is guilty of first degree robbery if in the commission of a robbery or immediate flight therefrom, he (1) is armed with a deadly weapon; or (b) displays what appears to be a firearm or deadly weapon; or (c) inflicts bodily injury. Wash. Rev. Code § 9A.56.200. "A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her

presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone." *Id.* § 9A.56.190. Petitioner does not argue that the jury instructions were constitutionally deficient. The Washington State Court of Appeals ruled that:

> The State presented evidence addressing every fact it needed to prove. The jury apparently disbelieved Mr. Lopez's version of all dispositive factual issues. We defer to the jury's assessment of conflicting testimony, witness credibility, and evidence weight. . . . Viewing the evidence in the light most favorable to the State, a rational jury could have found the essential elements of first degree robbery beyond a reasonable doubt. Therefore, sufficient evidence supports Mr. Lopez's first degree robbery conviction.

ECF No. 39-1 at 50.

The appellate court's finding does not constitute an unreasonable application of law or fact. Rather, the state court record conclusively demonstrates that Petitioner's conviction is supported by sufficient evidence. Nissen and Gonzalez testified that Petitioner shoved Gonzalez into the street, causing bodily injury. Petitioner then took Gonzalez's car from her presence and without her permission and engaged in a pursuit with police vehicles. The Court defers to the state court's assessment that the jury's determination was not irrational based on the evidence before it, and dismisses Petitioner's claim for relief.

### ii. Third-Degree Assault

A person is guilty of assault in the third degree if he, under circumstances not amounting to assault in the first or second degree, with criminal negligence, causes bodily harm to another person by means of a weapon or other instrument or thing likely to produce bodily harm. Wash. Rev. Code § 9A.36.031. Petitioner did not challenge his conviction for third degree assault in state court and thus his claim is unexhausted. Nonetheless, the state court record demonstrates that the jury's verdict with regard to the third-degree assault charge was not irrational. Deputy Reining testified at trial that she was involved in a pursuit of Petitioner's

vehicle. After the car was disabled and Petitioner was boxed in, Petitioner put the vehicle he was operating into reverse, ramming Deputy Reining's vehicle and causing her to receive a fat lip. ECF No. 36-1 at 1. Deputy Reining recounted her recollection of events at trial as a dash-camera video of the incident played. Deputy Reining's testimony was sufficient to sustain a conviction and was not contradicted by any other evidence in the record. Accordingly, Petitioner's challenge to his convictions as based on insufficient evidence is **dismissed**.

### F. Judicial Misconduct

Petitioner claims that the State and the trial judge denied him a fair trial by preventing defense counsel from introducing Nissen's 911 recording. As with Petitioner's Confrontation Clause claim, his allegations of judicial misconduct also fail. Neither the State nor the trial court prevented defense counsel from introducing Nissen's 911 recording. Rather, both parties agreed the recording was admissible impeachment evidence. As there is no evidence of interference or bias, Petitioner's claim is **dismissed**.

### G. Ineffective Assistance of Counsel

Petitioner argues his counsel was ineffective in failing to cross-examine Gonzalez and Deputy Reining regarding whether Petitioner lived with Gonzalez and unreasonably failed to seek admission of Nissen's 911 call. He also attacks defense counsel's failure to ask Deputy Reining why she failed to take a picture of her injured lip, which formed the basis of the State's assault case.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the ADEPA deference standard set forth in 28 U.S.C. § 2254(d). *Canales v. Roe*, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, Petitioner must establish two components. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994). First, Petitioner must show that his counsel's performance was deficient by proving that his counsel

made errors so serious that counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Judicial scrutiny of counsel's performance must be highly deferential so that the effects of hindsight can be eliminated. *Id.* at 689. There is a strong presumption that counsel's performance fell within the range of reasonable assistance. *Id.*

Second, Petitioner must show that his counsel's errors were so egregious as to deprive Petitioner of a fair trial, one whose result is reliable. *Id.* at 688. Petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the Petitioner as a result of the alleged deficiencies. *Id* at 697. Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail. *Id.* Ineffective assistance of counsel is analyzed under the "unreasonable application" prong of *Williams v. Taylor*, 529 U.S. 362 (2000).

### i. Living Situation

Petitioner first claims his counsel was ineffective for failing to impeach Gonzalez's testimony that Petitioner did not reside with her. These allegations were dismissed on direct appeal. The Court of Appeals found defense counsel's strategic and tactical decisions reasonable, including which witnesses to call, how to impeach witnesses, and whether to inform witnesses they may be charged with perjury for lying, stating that "these decisions do not fall below an objective standard of reasonableness and do not undermine confidence in the trial outcome." ECF No. 39-1 at 51. In considering Petitioner's PRP, the Court noted:

> Counsel then elicited extensive testimony from Mr. Miers, Sr. and Jr., that Mr. Lopez in fact lived full time with Ms. Gonzalez. Counsel thus aptly set up a credibility contest between Ms. Gonzalez and the

defense witnesses on that topic, which, in any event, was not itself determinative of whether Mr. Lopez committed first degree robbery. In other words, the jury could have believed that Mr. Lopez primarily lived with Ms. Gonzalez, but still found him guilty of first degree robbery. In this situation, Mr. Lopez does not show that he was prejudiced by any decision of counsel not to additionally attempt to impeach Ms. Gonzalez with the police report.

ECF No. 43-1 at 69.

Even assuming counsel's performance was deficient, which it was not, Petitioner has failed to show prejudice. Whether Petitioner and Gonzalez resided together was not determinative of the outcome of this case. Additionally, defense counsel did elicit testimony rebutting Gonzalez's assertion that Petitioner only stayed at her residence a few nights out of the week. Because Petitioner has not shown deficient performance, prejudice, or that the appeals court's finding is contrary to fact or law, this ground for relief is **dismissed**.

### ii.    Deputy Reining's Injuries

Petitioner posits that defense counsel was deficient in failing to ask Deputy Reining the reason she failed to obtain photographic evidence of her lip injury after engaging in a police vehicle pursuit with Petitioner. At trial, Deputy Reining testified that she was following Petitioner in her patrol vehicle after Petitioner's car hit road spikes. ECF No. 35-1 at 160. At that point, Petitioner was boxed in and Deputy Reining was in the process of exiting her vehicle when Petitioner reversed and rammed her police vehicle. As a result, the door was shoved into Deputy Reining's face and she received a fat lip. ECF No. 36-1 at 1. Petitioner fails to identify what, if any, impact this line of questioning would have had at trial. Deputy Reining's involvement in this case was undisputed and Petitioner submitted no evidence contradicting her version of events. Counsel's decision not to question Deputy Reining about her failure to document her evidence was

reasonable and resulted in no discernable prejudice to Petitioner. This claim for relief is dismissed.

### iii.   Conflict of Interest

Petitioner asserts that defense counsel had a conflict of interest because he was prevented from introducing Nissen's 911 recording. As previously discussed, there was no impediment to the introduction of the 911 recording; defense counsel chose not to pursue that strategy. The Court of Appeals concluded it was objectively reasonable for counsel not to play the recording:

> First, the impeachment value of the 911 recording would have been questionable at best when any inconsistencies with the trial testimony were matters of weight and credibility for the jury to decide, and Ms. Nissen's general description of the incident on the recording is corroborated by Ms. Gonzalez's trial testimony that Mr. Lopez did throw her into the street and take her car. Also, Tad Miers, Jr., testified he saw no one else at the scene who called 911, but it is clear from the trial testimony—and the 911 recording itself—that Ms. Nissen was the caller. Given the content of the recording (in which Ms. Gonzalez is also occasionally heard crying in the background), counsel engaged in reasonable strategy by not seeking to admit the 911 tape to draw further attention to the incident.

ECF No. 43-1 at 68-69.

The Court of Appeals' conclusion was reasonable and not contrary to law or fact. Defense counsel's strategy not to introduce Nissen's 911 recording, which could have resulted in significant prejudice to Petitioner, was reasonable as it had limited impeachment value. The discrepancies between Nissen's trial testimony, written statement, and 911 call were minimal. Moreover, Petitioner has failed to demonstrate prejudice resulting from counsel's failure to introduce the 911 recording at trial. The jury was able to properly evaluate the veracity of Nissen's testimony without the call. Accordingly, Petitioner's ineffective assistance of counsel claims are **dismissed**.

## IV.  Evidentiary Hearing

The AEDPA restricts the power of district courts to grant evidentiary hearings in limited situations. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). However, "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998). In the present case, Petitioner did not offer any other evidence to support his claims for relief, other than the state court record. An evidentiary hearing is not required because the Petitioner's issues can be resolved on the basis of that record alone. Accordingly, Petitioner's request for an evidentiary hearing is **denied**.

## Conclusion

Petitioner has not demonstrated that the state court's adjudication of his claims constituted an unreasonable application of law or fact. Accordingly, Petitioner's First Amended Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus By A Person in State Custody, ECF No. 11, is **dismissed** in its entirety.

//

//

//

//

//

//

//

//

Accordingly, **IT IS ORDERED:**

1. Petitioner's First Amended Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus By A Person in State Custody, ECF No. 11, is **DISMISSED with prejudice**. Furthermore, any appeal taken by Petitioner of this matter would not be

**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS** + 30

taken in good faith as he fails to make a substantial showing of the denial of a constitutional right. It is not apparent that reasonable jurists would differ on whether the petition should have been resolved in a different manner. Accordingly, any request for a certificate of appealability would be denied.

2. Petitioner's request for an evidentiary hearing is **DENIED**.

3. The District Court Executive is directed to enter judgment in favor of Respondent and against Petitioner.

**IT IS SO ORDERED.** The District Court Clerk is hereby directed to enter this Order, provide copies to counsel and pro se Petitioner, enter judgment, and **close** this file.

**DATED** this 29th day of June 2018.



Stanley A. Bastian
United States District Judge